UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| PARKER STEWART, IMINDY, LLC, AND ITS SUCCESSORS AND ASSIGNS;<br><br>Plaintiffs,<br><br>vs.<br><br>PLAINS COMMERCE BANK, CHRISTOPHER HAMZE, INDIVIDUALLY AND AS MEMBER OF IMINDY, LLC, MEMBER OF TEE LAUNCH LB, ORGANIZER & REGISTERED AGENT OF FANTOM DTG, LLC & ORGANIZER OF INFINITE SUPPLY, LLC; NICHOLAS HAMZE, INDIVIDUALLY AND AS ORGANIZER & REGISTERED AGENT OF FYMCO, LLC, ORGANIZER OF FANTOM DTG, LLC AND ORGANIZER & REGISTERED AGENT OF INFINITE SUPPLY, LLC; TED HAMZE, CHRISTOPHER MARBUS, FYMCO, LLC, AND ITS SUCCESSORS AND ASSIGNS; TEELAUNCH LB, AND ITS SUCCESSORS AND ASSIGNS; FANTOM DTG, LLC, AND ITS SUCCESSORS AND ASSIGNS; INFINITE SUPPLY, LLC, AND ITS SUCCESSORS AND ASSIGNS; AND DISTRICT PHOTO, AND ITS SUCCESSORS AND ASSIGNS;<br><br>Defendants. | 4:25-CV-04007-RAL<br><br><br>OPINION AND ORDER GRANTING MOTIONS TO DISMISS WITHOUT PREJUDICE |

Plaintiffs Parker Stewart (Stewart) and imINDY, LLC (imINDY) allege federal jurisdiction under the Racketeer Influenced and Corrupt Organizations Act (RICO) and bring certain state law claims invoking supplemental jurisdiction. Plaintiffs also seek a Declaratory

1

Judgment under 28 U.S.C. § 2202 to void a buyout agreement, Doc. 1-23, whereby Plaintiff Stewart sold his ownership interest in imINDY to Defendant Christopher Hamze (Chris).

Before this Court are three motions to dismiss, filed by three groups of Defendants: (1) Plains Commerce Bank (PCB) and its employee Christopher Marbus (Marbus); (2) Chris, Nicholas Hamze (Nick), FYMCO, LLC (FYMCO), Fantom DTG LLC (Fantom), Infinite Supply, LLC (Infinite Supply); and (3) District Photo. Docs. 38, 41, 57. This Court previously denied a Motion to Dismiss filed on behalf of Ted Hamze because Ted had passed away ten days before the motion was filed. Doc. 53. Defendant TeeLaunch LB has not been served, and Plaintiffs filed a Motion for Alternative Service of TeeLaunch LB, which is a Lebanese corporation. Doc. 74. Plaintiffs oppose the motions to dismiss and attach to their responses an amended complaint for this Court to consider as a cure for any alleged defects. See Docs. 60, 60-1, 61, 61-1, 64, 64-1. This Court held a hearing on the motions to dismiss on September 8, 2025. Plaintiffs, after the hearing, filed a Motion for Leave to File Amended Complaint and attached a different version of a proposed amended complaint. Docs. 81, 81-1. For the reasons explained below, the motions to dismiss are granted as to the RICO claims for lack of standing, and this Court declines to exercise supplemental jurisdiction over the remaining state-law claims or grant leave to amend as doing so would be futile.

## I.    Factual Allegations[1]

Stewart and Chris are second cousins who founded imINDY in 2012. Doc. 1 ¶ 17. Under the Operating Agreement, Stewart and Chris were 50% owners of imINDY after each initially

---

[1] This Court takes the facts from Plaintiffs' Complaint and its attachments and is making no factual findings as part of this decision.

contributed $10,000 in capital. Id. ¶¶ 22–26. imINDY is a South Dakota limited liability company that provided customized printing services. Id. ¶ 22.

imINDY opened a bank account with PCB, and all payments made from imINDY's account were subject to a Two-Party Authorization Agreement (TPAA), as required by PCB. Id. ¶¶ 18, 28. The TPAA mandated Stewart and Chris to expressly authorize each payment, transfer, withdrawal, or action on the account with imINDY. Id. ¶ 18. Marbus, the Vice President of Business Intelligence at PCB, was to oversee and enforce the TPAA. Id. ¶¶ 7, 18. Marbus was to ensure that both Chris and Stewart authorized all payments before PCB released funds from imINDY's account. Id. ¶ 29. The TPAA was to protect imINDY's account from unauthorized withdrawals or transfers by either Chris or Stewart without first providing notification or approval from the other. Id. ¶ 32. The TPAA's duration was indefinite, and Stewart and Chris executed five subsequent, identical TPAAs, the last on October 19, 2015, which contained an indefinite effective date. Id. ¶¶ 34–35.

During the first year and a half of imINDY's operations, Stewart organized and managed most of the daily business tasks, which included conducting sales, gaining printing contracts, managing equipment, and performing customer service and employee training. Id. ¶ 36. In 2015, Chris hired his brother Nick to assist in the daily management of imINDY to keep up with its continual growth. Id. ¶ 38. Chris decided to hire Nick unilaterally and raised Nick's salary each year without Stewart's knowledge. Id. ¶ 39. Between 2016 and 2020, Nick and Chris filed articles of organization for three separate entities Stewart alleges are shell companies or alter egos of imINDY: FYMCO on January 8, 2016, Infinite on October 31, 2018, and Fantom on June 29,

2020.[2]  Id. ¶¶ 40, 57, 62.  FYMCO's principal place of business is Chris and Nick's home, and Infinite and Fantom were registered to the same address as imINDY.  Id.  Stewart alleges that each company was formed to either transfer money out of imINDY or to funnel money or divert corporate opportunities from imINDY.  Id.

In early 2017, Stewart sought outpatient medical treatment, and, at Chris's suggestion, took a leave of absence from managing imINDY's daily operations.  Id. ¶¶ 46–47.  Stewart's leave of absence began around August 2017, and he was prepared to make a full return to imINDY on or about March 1, 2018.  Id. ¶ 48.  Stewart did not inform Marbus or PCB that he was on leave and no longer performing daily operations, and Stewart expected to authorize payments from imINDY's account in accordance with the TPAA, as the TPAA remained in place.  Id. ¶¶ 48–50. Chris instructed Stewart to solely focus on his family and his medical issues while on leave and assured Stewart that everything at the business was fine.  Id. ¶ 53.  During Stewart's absence, Chris unilaterally executed every payment, and PCB through Marbus validated the payments without Stewart's authorization.  Id. ¶ 52.  Stewart alleges Chris and Marbus deliberately concealed imINDY's operations from Stewart by submitting and validating the transactions with only one signature.  Id. ¶ 52.  Stewart further alleges that Chris withheld imINDY's records in violation of the Operating Agreement to mislead Stewart about the financial state of imINDY and that Chris refused to share access to the QuickBooks account used to track imINDY's transactions and taxes. Id. ¶ 54.

---

[2] At the hearing, defense counsel for Chris and Nick maintained that FYMCO owned the real property leased by imINDY, and that Infinite and Fantom purchased and owned certain other assets used by imINDY.  This Court, however, in ruling on a motion to dismiss, must consider only the allegations of the Complaint and attachments thereto.

The Complaint alleges that Chris and Nick began diverting in July 2018 imINDY's money and business opportunities into District Photo, which the Complaint alleges to be Chris's and Nick's successor company[3] with a principal place of business in Maryland. Id. ¶¶ 12, 56. Initially, imINDY's payments to District Photo were small, but from December 2018 until at least April 2023, payments to District Photo regularly exceeded $100,000 and were as large as $600,000. Id. ¶ 56. District Photo acquired[4] imINDY on or about August 15, 2024. Id. ¶ 119.

On December 3, 2020, Chris registered the fictitious business name TeeLaunch to imINDY. Id. ¶ 64. Under the fictitious business name, Chris and Nick transferred money to FYMCO, Infinite, and Fantom without Stewart's knowledge. Id. ¶¶ 64–65. Stewart later learned through Chris's announcement on imINDY's website that imINDY had made more business decisions that Stewart did not authorize: imINDY moved into a new 28,000 square foot building, developed an app for e-commerce to generate print files and mockups, and opened an app development and customer service company in Lebanon (TeeLaunch LB), which sought to hire web developers in Lebanon. Id. ¶¶ 66–67.

---

[3] District Photo's Motion to Dismiss argues an absence of personal jurisdiction over it and notes the absence of any allegations in the Complaint of specific or general personal jurisdiction in South Dakota over District Photo. Docs. 57, 58. District Photo filed no affidavit but attached a public record showing that District Photo Inc. registered in September of 1980 as a District of Columbia company and has its principal place of business in Beltsville, Maryland, and Neil Cohen and Jeffery Sim (rather than Chris and Nick) are its beneficial owners. Doc. 58-1.

[4] The newly proposed amended complaint added a footnote stating, "Defendant District Photo, availed to this case through successor liability, purchased assets, engaged in a defacto [sic] merger/consolidation with, assuming debt and liabilities for and in the furtherance of a fraudulent RICO scheme named herein as the SCCNMTP enterprise." Doc. 81-1 at 5 n.1. This addition is confusing on multiple levels. First, the acronym SCCNMTP is entirely new and undefined. Second, the allegation that District Photo has "successor liability" is peculiar as it appears to be the successor to Plaintiff in imINDY, and Plaintiffs are alleging imINDY was wronged.

From 2021 until 2023, tensions rose with Chris instructing Stewart to stay away from imINDY's workplace and refusing to provide Stewart imINDY's books and records in QuickBooks, while Nick did not maintain any regular communication with Stewart regarding imINDY. Id. ¶ 68. During this time, imINDY made thirteen payments to TeeLaunch LB totaling $330,722. Id. ¶ 80. Marbus never obtained Stewart's authorization for these transfers to TeeLaunch as required under the TPAA, notwithstanding Stewart maintaining communication with Marbus. Id. ¶ 68. Twelve of the payments contained either no description or simply a description of "wire payment" in imINDY's QuickBooks. Id. ¶ 81. Chris unilaterally withheld Stewart's salary for at least one year while he continued to transfer money out of imINDY into the alleged shell companies or alter ego companies, while still taking a salary for himself and Nick. Id. ¶ 70.

On March 13, 2023, Chris asked Stewart to execute a Buyout Agreement, whereby Stewart would sell his shares to Chris and resign from imINDY in exchange for $225,000, which was half of the money in imINDY's account and included none of imINDY's other assets. Id. ¶ 71. Stewart countered, without full knowledge of fraudulent transfers out of imINDY, offering to sell his interest in imINDY for $500,000. Id. ¶ 74. Chris replied that imINDY was losing money and nearing bankruptcy, yet imINDY's account balance at the time was around $700,000. Id. ¶¶ 75–76, 298; see Doc. 1-15 at 10.

While buyout negotiations continued, Stewart contacted PCB Branch Manager Phil Bedinger to request assistance in reviewing imINDY's account for all international transactions. Doc. 1 ¶ 80. Bedinger confirmed the payments imINDY made to TeeLaunch LB. Id. On or about June 1, 2023, Stewart received access to copies of imINDY's QuickBooks records, revealing tens of thousands of transactions that Stewart had not authorized as required under the TPAA.

Id. ¶¶ 84–85.  Around this time, Stewart obtained a printout of imINDY's PCB account activity. See Doc. 1-15.

On or about September 1, 2023, Stewart discovered that imINDY was paying large amounts of money to FYMCO, Fantom, and Infinite—entities he had never heard Chris, Nick, or Marbus mention.  Doc. 1 ¶ 87.  Upon discovering the payments, Stewart sent a letter to PCB informing PCB that it was in violation of the TPAA.  Id. ¶ 88.  Stewart again requested a current statement of imINDY's account balance and updated books and records, but Chris declined to provide the records.  Id. ¶ 89.  On September 14, 2023, Marbus met with Stewart, Nick, and Chris to discuss imINDY's account at PCB; Marbus said that PCB would be enforcing the TPAA going forward.  Id. ¶¶ 92–93.  Marbus established that Chris would send Stewart a summarized list of payments needing to be authorized for Stewart to review.  Id. ¶ 93.  Outside of Marbus's presence, Stewart, Chris and Nick continued to negotiate the buyout, and Chris allegedly threatened to "torpedo the company" if Stewart did not accept the buyout.  Id. ¶¶ 94–95.

The PCB 2023 General Ledger reported debits from the alleged shell companies that were omitted from Stewart's version of the 2023 QuickBooks: (1) $58,886.50 on June 2, 2023, in a payment from FYMCO; (2) $35,634.50 on June 1, 2023, in a payment from Fantom; (3) $56,278 on July 5, 2023, in a payment from FYMCO; and (4) $25,773 on July 5, 2023, in a payment from Fantom.  Id. ¶ 104.  imINDY never received payments from the shell companies, and Plaintiffs believe that imINDY did, causing the transactions to be flipped "to artificially represent imINDY was performing worse than it was, especially in transactions involving the shell companies/alter egos/successor company(s)."  Id. at 30 n.9.

Chris and Nick told Stewart around September 22, 2023, that imINDY was hemorrhaging money.  Id. ¶ 102.  Chris attempted to block Stewart's access to financial information, and Stewart

called Bedinger at PCB to reset the imINDY account password to get access to imINDY's PCB account statement, albeit briefly. Id. ¶ 106.

Because of economic duress and Chris's threats to destroy imINDY, Stewart signed a buyout agreement on September 27, 2023, selling his interest in imINDY to Chris for $550,000 and releasing all claims against "Christopher or imINDY LLC relating to or in any way arising out of Christopher's and Parker's ownership of and employment through imINDY LLC." Doc. 1-23 at 3; see Doc 1 ¶¶ 108–09. At the time he signed the agreement, Stewart believed that some records within imINDY's QuickBooks were incorrect, but he did not know the extent of the misinformation. Doc. 1 ¶ 108. Stewart was represented by counsel during the buyout negotiations who advised Stewart that he could seek a forensic accounting of imINDY before finalizing any agreement, but Stewart forewent any forensic examination. Doc. 1-18 at 5; see also Doc. 1-13 at 3.

On or about October 1, 2023, three days after he signed the buyout agreement, Stewart discovered throughout the ten years of QuickBooks records provided, there were more than 27,000 payments totaling around $200,000,000 without any information in the memo description column. Doc. 1 ¶ 112. Around 400 payments were made to the alleged shell or alter ego companies of imINDY, including payments for rent, fictitious costs of goods sold, and other wire payments without any descriptions, totaling $21,425,000 from January 2017 to May 2023. Id. ¶¶ 113–14. Stewart also uncovered payments made on an unapproved credit card totaling over $13,000,000 during that same period. Id. ¶ 115. After comparing all the imINDY records with the PCB general ledgers, Stewart noticed forty payments to the shell or alter ego companies that were omitted from QuickBooks, totaling over $1,000,000. Id. ¶ 116. These transactions, amounting to $34,325,000, were improperly approved by Marbus in violation of the TPAA. Id. ¶ 117.

8

District Photo acquired imINDY on August 15, 2024, and imINDY and TeeLaunch LB were dissolved on August 16, 2024. Id. ¶ 119; Doc. 1-24. Infinite had been dissolved on February 15, 2022, and Fantom had been dissolved on October 16, 2022. Doc. 1 ¶ 120; Doc. 1-26. Although Fantom was dissolved, imINDY's records indicate payments were made to Fantom after its dissolution date. Doc. 1 ¶ 120.

The Plaintiffs allege fourteen total claims of relief, some by Stewart and imINDY together and some by Stewart alone. The Plaintiffs seek a declaratory judgment to void the buyout agreement (Count 1) and damages for violation of RICO (Counts 2–4), fraudulent misrepresentation (Count 5), negligent misrepresentation (Count 6), civil conspiracy (Count 7), breach of contract as to the TPAA (Count 8), breach of contract as to the operating agreement (Count 9), conversion (Count 10), breach of fiduciary duty (Counts 11–12), unjust enrichment (Count 13), and aiding and abetting (Count 14). See id. ¶¶ 121–315.

The Defendants in their motions to dismiss argue that Stewart lacks standing to sue on behalf of imINDY, a now defunct business whose assets are owned by District Photo and from which Stewart divested in September of 2023. The Defendants also argue that Plaintiffs fail to state RICO claims and that this Court should not exercise supplemental jurisdiction over the remaining state law claims. District Photo echoes these positions in its motion and includes a challenge to personal jurisdiction over District Photo in South Dakota.

## II.    Standard on Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6), courts must accept a plaintiff's factual allegations as true and construe all inferences in the plaintiff's favor but need not accept a plaintiff's legal conclusions. Retro Television Network, Inc. v. Luken Commc'ns, LLC, 696 F.3d 766, 768–69 (8th Cir. 2012). To survive a motion to dismiss for failure to state a claim, a complaint

must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are unnecessary, the plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Iqbal, 556 U.S. at 678, "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely,'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Still, "conclusory statements" and "naked assertion[s] devoid of further factual enhancement" do not satisfy the plausibility standard. Iqbal, 556 U.S. at 678 (alteration in original) (citation and internal marks omitted).

"When pled as RICO predicate acts, mail and wire fraud require a showing of: (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme." Wisdom v. First Midwest Bank, 167 F.3d 402, 406 (8th Cir. 1999).

Rule 9(b) of the Federal Rules of Civil Procedure requires parties alleging fraud to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and "applies to allegations of mail and wire fraud," Abels v. Farmers Commodities Corp., 259 F.3d 910, 921 (8th Cir. 2001). See also Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 428–29 (8th Cir. 2009) (same). Such circumstances include "the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." H & Q Props., Inc. v. Doll, 793 F.3d 852, 856 (8th Cir. 2015) (cleaned up and citations omitted). Rule 9(b) is to be interpreted "in harmony with the principles of notice pleading." Star

City Sch. Dist. v. ACI Bldg. Sys., LLC, 844 F.3d 1011, 1016 (8th Cir. 2017) (citation omitted). "This higher degree of notice is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." Drobnak v. Andersen Corp., 561 F.3d 778, 783 (8th Cir. 2009) (cleaned up and citations omitted). Facts "peculiarly within the opposing party's knowledge" may be pleaded on information and belief, but conclusory allegations of fraud or deception are insufficient to satisfy the rule. Id. at 783–84.

### III.    Standing Challenge

### A.  Article III Standing

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Murthy v. Missouri, 603 U.S. 43, 56 (2024). Courts implement this limit through different justiciability doctrines, including standing and ripeness. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352–53 (2006). Broadly speaking, the standing inquiry concerns whether the plaintiff is the appropriate party to bring a particular suit. Raines v. Byrd, 521 U.S. 811, 818 (1997); Flast v. Cohen, 392 U.S. 83, 99–100 (1968). The three requirements for standing are (1) an injury in fact, (2) that the injury likely was caused by the defendant, and (3) a likelihood that a favorable decision will redress the injury. FDA v. All. for Hippocratic Med., 602 U.S. 367, 380 (2024); Animal Legal Def. Fund v. Vaught, 8 F.4th 714, 718 (8th Cir. 2021) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).

To satisfy Article III standing, an injury in fact "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (cleaned up and citation omitted). A "concrete" injury means "that it must be real and not abstract." All. for Hippocratic Med., 602 U.S. at 381 (citation omitted). A "particularized" injury means that it "must affect 'the plaintiff in a personal and individual way' and not be a

generalized grievance." Id. (quoting Lujan, 504 U.S. at 560 n.1). "Moreover, the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." Id. (citation omitted). The "second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" Id. at 380 (citation omitted). Causation requires a plaintiff to show an "injury likely was caused or likely will be caused by the defendant's conduct." Id. at 382. "[T]he causation requirement screens out plaintiffs who were not injured by the defendant's action." Id. at 383. For causation, "the plaintiff must show a predictable chain of events" connecting defendant's action to the asserted injury. Id. at 385. Where the defendant's action caused injury, redressability—the third element of standing—typically exists through injunctive action or an award of damages. Id. at 381.

While Defendants framed the issue as one of Article III standing, the arguments raised in Defendants' briefs do not directly concern the justiciability of the claims. Instead, Defendants' arguments raise issues concerning prudential standing, such as third-party and shareholder standing. While the United States Court of Appeals for the Eighth Circuit has not directly addressed the issue, most circuit courts hold prudential standing doctrines are "non-jurisdictional, implicating only a plaintiff's power to bring claims, not the Court's power to hear them." Potter v. Cozen & O'Connor, 46 F.4th 148, 155 (3d Cir. 2022).[5] While "[t]he distinction between constitutional and prudential standing can . . . be elusive," the difference is procedurally important as a defendant must move to dismiss under Rule 12(b)(6) when raising prudential standing and under Rule 12(b)(1) when raising Article III standing. Id. at 155–57. Defendants moved to dismiss

---

[5] The Eighth Circuit has not always been consistent in identifying whether third-party and shareholder standing are jurisdictional or prudential issues, and consequently whether failure to state a claim or lack of jurisdiction is the proper vehicle for dismissal. See Wolf v. Altmann, No. 4:22-CV-397, 2022 WL 17735541, at *16–17 (E.D. Mo. Dec. 16, 2022) (discussing the inconsistencies).

under both Rule 12(b)(1) and Rule 12(b)(6), so this Court addresses both Article III and prudential standing.

Plaintiffs have satisfied Article III standing. The Complaint alleges that Defendants fashioned a scheme to siphon money and business opportunities from imINDY and Stewart. According to Plaintiffs, certain Defendants intentionally withheld information to misappropriate funds for the benefit of other Defendants and at Plaintiffs' expense. Such allegations sufficiently state that Stewart and imINDY suffered an actual, concrete, and particularized "invasion of a legally protected interest" resulting from Defendants' acts. Lujan, 504 U.S. at 560. And favorable decisions granting the monetary and declaratory relief Stewart and imINDY seek would redress their alleged injuries.

## B. Prudential Standing and Real Party in Interest

### 1. Rule 17 Standard

Defendants, raising a prudential ground to dismiss the action for lack of standing, argue that imINDY is an improper plaintiff and that Stewart lacks standing to bring claims in his individual capacity because the injuries were to imINDY and only affected Stewart's interest in the business. Doc. 39 at 11–16; Doc. 42 at 8–11; Doc. 58 at 2. Rather than implicating this Court's jurisdiction, these arguments challenge whether Plaintiffs' action is being prosecuted by "the real party in interest" and whether imINDY has capacity to sue under Rule 17 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 17(a)(1), (b). "Some courts have described Rule 17's real-party-in-interest requirement as essentially a codification of" the prudential standing principle that "a litigant cannot sue in federal court to enforce the rights of third parties." Rawoof v. Texor Petroleum Co., 521 F.3d 750, 757 (7th Cir. 2008) (listing cases). One purpose of Rule 17 is to "require[] that the plaintiff actually possess, under the substantive law, the right sought to be

13

enforced." Curtis Lumber Co. v. La. Pac. Corp., 618 F.3d 762, 771 (8th Cir. 2010) (cleaned up and citation omitted).

### 2.  Whether Stewart can sue on behalf of imINDY

Defendants assert imINDY is an improper plaintiff for three reasons: (1) imINDY was administratively dissolved;[6] (2) by executing the buyout agreement, Stewart was no longer a member of imINDY at the time of this lawsuit; and, at the motion hearing (3) Defendant District Photo, and not Stewart, owns imINDY's assets and right to sue. See Doc. 39 at 11–16; Doc. 42 at 8–11; Doc. 58 at 2, 2 n.2. The first argument more accurately concerns imINDY's capacity to sue under Rule 17(b) of the Federal Rules of Civil Procedure. See Lundquist v. Univ. of S.D. Sanford Sch. of Med., 705 F.3d 378, 379 (8th Cir. 2013) ("Unlike the doctrines of standing and real-party-in-interest, capacity is conceived to be a party's personal right to litigate." (cleaned up and citation omitted)). As a limited liability company, imINDY's capacity to sue is determined "by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3). Thus, South Dakota law governs whether imINDY has the capacity to sue.

Under South Dakota law, "[a] limited liability company is a legal entity distinct from its members" and "[a] member of a limited liability company is not a proper party to proceedings by or against a limited liability company." SDCL § 47-34A-201. Administrative dissolution does

---

[6] The Complaint alleges that District Photo acquired imINDY on or about August 15, 2024, the day before it was administratively dissolved. Doc. 1 ¶ 119. Defense attorneys at the hearing referred to District Photo buying the assets of imINDY, but the Complaint was silent on what sort of acquisition occurred, and this Court takes the facts from the Complaint in ruling on a motion to dismiss. As noted in footnote 4 earlier, the latest proposed amended complaint alleges that "District Photo[] availed to this case through successor liability." Doc. 81-1 at 5 n.1. The proposed amended complaint then claims District Photo "purchased assets," but in a de facto "merger/consolidation," assuming debts and liabilities of imINDY, and doing so more than ten months after Stewart sold his interest in imINDY was "in the furtherance of a fraudulent RICO scheme." Id.

not necessarily preclude a limited liability company from bringing a lawsuit.  See SDCL § 47-34A-803(c) (providing that a person winding up a limited liability company's business may "prosecute and defend actions and proceedings, whether civil, criminal, or administrative").  A limited liability company under South Dakota law has capacity to sue "while it ha[s] been administratively dissolved but not yet terminated as a legal entity." Mach v. Connors, 979 N.W.2d 161, 168 (S.D. 2022); see also SDCL § 47-34A-805 (discussing termination of a limited liability company following dissolution and winding up).  imINDY was administratively dissolved on August 16, 2024, but the record is unclear on if it has been terminated.[7] Doc. 1-24.  Thus, imINDY appears to still be able to prosecute a civil action.

But while imINDY may have capacity to sue, Stewart as an ex-member, does not have the statutory standing to bring any action on its behalf.  Dissociation terminates a member's "right to participate in the management and conduct of the company's business . . . and the member ceases to be a member."  SDCL § 47-34A-603(b)(1).  Under South Dakota law, "[a] member may maintain a derivative action to enforce a right of a limited liability company."  SDCL § 47-34A-1102.  Such a lawsuit "may be maintained only by a person that is a member *at the time the action is commenced* and remains a member while the action continues."  SDCL § 47-34A-1103(a) (emphasis added).  Stewart claims that the buyout agreement was fraudulent and seeks declaratory relief to "reinstat[e] his 50% interest in imINDY." Doc. 1 ¶ 128.  But South Dakota law provides no exception for an ex-member alleging fraud to enforce the rights of a limited liability company.

Stewart's argument to the contrary turns on a presumption that the buyout agreement is already null and he resumes the 50% interest in imINDY that he sold in September of 2023.

---

[7] The Complaint did not attach and the record does not contain, for instance, the agreement by which District Photo acquired imINDY's assets and perhaps claims.

Doc. 61 at 3 (arguing that the "claim for declaratory relief is properly pleaded, rendering the Buyout Agreement null and void and placing Plaintiffs[] in privity of contract with the Hamze Defendants" and that the "claims establish that the Buyout Agreement is unenforceable in regard to all Defendants and in establishing RICO claims as to the Hamze Defendants"). However, Stewart has not cited any authority to support his argument that simply by claiming the buyout agreement to be null, he can act as if he were still a member of imINDY and sue on its behalf. This Court cannot assume both that the buyout agreement is null and that whatever agreement whereby District Photo acquired imINDY[8] likewise is null. And the latter claim is not made in the Complaint or proposed amended complaints at all.

### 3. Whether Stewart can bring RICO claims on his own

The Defendants also assert that Stewart is an improper plaintiff to assert RICO claims. Stewart alleges fourteen claims individually. "Section 1962 of the RICO Act makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Gomez v. Wells Fargo Bank, N.A., 676 F.3d 655, 660 (8th Cir. 2012) (cleaned up and citation omitted). Section 1961 defines "racketeering activity," and here Plaintiffs rest their claims on § 1961(1)(B) defining a racketeering activity to include "any act which is indictable under . . . title 18, United States Code: . . . section 1341 (relating to mail fraud), [and] section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). RICO provides a private cause of action to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter," and allows a person

---

[8] The Complaint attached several documents but did not include anything from the sale of imINDY to District Photo, other than a blog post. See Doc. 1 ¶ 119; Doc. 1-25.

to "sue therefor in any appropriate United States district court and [] recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). See also Dahlgren v. First Nat'l Bank of Holdrege, 533 F.3d 681, 689 (8th Cir. 2008).

The Defendants argue that Stewart does not have standing in his individual capacity to assert his RICO claims. These arguments center on the assertion that Stewart has not suffered a direct injury and instead has only alleged injuries that are purely derivative of corporate injuries suffered by imINDY. Doc. 39 at 16–18; Doc. 42 at 10–11; Doc. 58 at 2, 2 n.2. Because "[a] limited liability company is a legal entity distinct from its members," SDCL § 47-34A-201, Stewart "must plead an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company," SDCL § 47-34A-1101. See also Powers v. Ohio, 499 U.S. 400, 410 (1991) ("[A] litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."); Rawoof, 521 F.3d at 757 ("This [shareholder-standing] rule holds that a shareholder generally cannot sue for indirect harm he suffers as a result of an injury to the corporation.").

Standing in a civil RICO case requires "both factually and proximately caused injury to the plaintiffs' business or property." Newton v. Tyson Foods, Inc., 207 F.3d 444, 446–47 (8th Cir. 2000) (citing Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 265–68 (1992)); see also Asa–Brandt, Inc. v. ADM Inv. Servs., Inc., 344 F.3d 738, 752 (8th Cir. 2003) ("To have standing to make a RICO claim, a party must have 1) sustained an injury to business or property 2) that was caused by a RICO violation."). This "showing of injury requires proof of concrete financial loss, and not mere injury to a valuable intangible property interest." Regions Bank v. J.R. Oil Co., LLC, 387 F.3d 721, 728 (8th Cir. 2004) (citation omitted). A plaintiff asserting an injury that is purely derivative of a corporate injury lacks standing to sue under RICO without a showing of a direct

17

injury. Brennan v. Chestnut, 973 F.2d 644, 648 (8th Cir. 1992) ("A shareholder may not maintain an action for an injury to a corporation resulting in a diminution in the value of shares under RICO absent a showing of individual and direct injury to the shareholder.") (citing Flynn v. Merrick, 881 F.2d 446, 450 (7th Cir. 1989); Rand v. Anaconda–Ericsson, Inc., 794 F.2d 843, 849 (2d Cir. 1986); Warren v. Mfrs. Nat'l Bank, 759 F.2d 542, 544 (6th Cir. 1985)). See also Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 612–13 (6th Cir. 2004).

Stewart pleads three RICO claims, naming all of the Defendants. In Count 2 of the Complaint, Stewart alleges the following three injuries as forming the basis of his civil RICO claim asserted under 18 U.S.C. § 1962(c): (1) the Defendants diverted money and business opportunities away from imINDY to other companies founded by Chris and Nick, which led to "the diminution of [Stewart's] ownership stake" and "the undercapitalization of imINDY"; (2) Chris and Nick's fraudulent depletion of imINDY's accounts misrepresented imINDY's financial health to Stewart during the Buyout Agreement negotiations, which led to Stewart's "eventual undervalued acceptance of the Buyout Agreement"; and (3) Chris, with other Defendants' knowledge, withheld Stewart's salary and quarterly disbursements, instead diverting the money to other companies founded by Chris and Nick, which led to Stewart's "loss of rightful earnings from imINDY." Doc. 1 ¶¶ 129–43. In Count 3, Stewart alleges the following three injuries as forming the basis of his civil RICO claim asserted under 18 U.S.C. § 1962(b): (1) the Defendants diverted money and business opportunities away from imINDY, including by violating the TPAA; (2) the Defendants' actions caused Stewart "damage to his professional reputation and personal well-being"; and (3) the Defendants "deprived Stewart of his lawful share of money and benefits." Id. ¶¶ 144–57. In the final count brought under RICO, Count 4, Stewart alleges the following two injuries as forming the basis of his civil RICO claim asserted under 18 U.S.C. § 1962(d): (1) the Defendants

participated in a RICO scheme that took money away from imINDY, thereby "defrauding [Stewart] by depriving him of his rightful assets and diminishing the value of his ownership stake"; and (2) the Defendants concealed their actions by misleading Stewart as to the financial health of imINDY. Id. ¶¶ 158–74. His claimed injuries overlap, and in briefing, Stewart specifically identifies the following four direct injuries: (1) rightful earnings/loss of income/loss of benefits from imINDY; (2) the diminution of his ownership stake/investment value in imINDY; (3) his undervalued acceptance of the Buyout Agreement; and (4) damage to his professional reputation and personal well-being. See Doc. 60 at 12.

Cases from the Eighth Circuit and elsewhere show that these allegations are not enough to establish a direct injury to business or property to have standing for a RICO claim. In Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc., the Eighth Circuit affirmed the granting of the motion to dismiss for lack of standing where a former shareholder brought RICO claims following the acquisition of his company by the defendant. 528 F.3d 1001, 1023–25 (8th Cir. 2008). The plaintiff argued for an exception to the general rule that shareholders lack standing to bring derivative claims individually because he was no longer a shareholder and could not pursue a derivative action. Id. The Eighth Circuit reviewed similar cases that "held that a shareholder lacks standing to pursue derivative claims individually even where, as in this case, the shareholder could not have pursued a derivative action because he no longer held stock in the allegedly injured company or he was otherwise barred from bringing a derivative suit." Id. at 1025. While the Eighth Circuit noted in Craig Outdoor that there may be "a case in which equity demands an exception to the derivative-standing rule, [] this [was] not such a case" as the former shareholder "apparently knew about [the defendant's] alleged" fraudulent activity "roughly six months before he sold his Wilson–Curtis shares to [the defendant]" and thus "could have brought a derivative

action on behalf of Wilson–Curtis prior to the sale of his shares." Id. at 1025, 1025 n.11 (citing Lakonia Mgmt. Ltd. v. Meriwether, 106 F. Supp. 2d 540, 551 n.20 (S.D.N.Y. 2000) (stating "no unfairness" in dismissing suit for lack of standing when former shareholder had knowledge of allegedly objectionable conduct before sale of shares and had opportunity to bring derivative action but did not)).

Although Craig Outdoor concerned the acquisition of one company by another, courts have also found a lack of standing under RICO when former shareholders allege that the fraudulent activities of the remaining shareholders diminished their buyout price. The court in Prichard, for example, found no standing because plaintiffs, proceeding "in their individual capacities, cannot base their RICO claims on frauds they say occurred *prior* to their selling their shares in [the company] to defendants." Prichard v. 164 Ludlow Corp., 390 F. Supp. 2d 408, 410–11 (S.D.N.Y. 2005). Because the "injuries were suffered, if at all, while plaintiffs were shareholders," they were "derivative in nature." Contrast id. at 411 with Lochhead v. Alacano, 697 F. Supp. 406, 411–13 (D. Utah 1988) (holding that a "shareholder has a direct right to attack a corporate transaction which dilutes [a shareholder's] proportionate ownership," such as a merger of a corporation into another corporation) (citation omitted) and Ceribelli v. Elghanayan, 990 F.2d 62, 64 (2d Cir. 1993) (shareholders had standing to bring RICO claim where the defendant violated independent duty to disclose material information to shareholders *before* they purchased shares, thereby causing injury to those individuals separate and distinct from company's injury).

Many courts have declined to carve out exceptions to this rule distinguishing direct and derivative shareholder actions even in closely held corporation settings. See Frank v. Hadesman & Frank, Inc., 83 F.3d 158, 161–62 (7th Cir. 1996) (refusing to create a special rule for direct actions in closely held corporations, even when there are only two investors and one is the

wrongdoer); Elmhurst Consulting, LLC v. Gibson, 219 F.R.D. 125, 127 (N.D. Ill. 2003) (finding that misappropriating corporate assets and usurping business opportunities are "classic examples of injuries done to the corporation" that the shareholder can only redress in a derivative action); Small v. Sussman, 713 N.E.2d 1216, 1219–21 (Ill. App. Ct. 1999) (affirming the dismissal of a direct shareholder suit for breach of fiduciary duty against a corporation and its principal shareholder who wasted corporate assets and diverted them to outside the business or to himself, rejecting an argument that an exception should be drawn in Illinois for minority shareholders in closely held corporations, and noting the fact that the corporation had been sold and was part of another entity did not change the derivative requirement) (cited in Craig Outdoor, 528 F.3d at 1025). This principle is also reflected in South Dakota law, as noted above, where "[a] member maintaining a direct action under this section must plead an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company." SDCL § 47-34A-1101(b); see also Mach, 979 N.W.2d at 167.

In determining whether an alleged injury was direct or derivative in nature in the RICO context, other courts have focused on whether the target of the alleged RICO scheme was the individual or the company itself. For example, then-Judge Sotomayor wrote that the Second Circuit's civil RICO jurisprudence had previously "rejected the plaintiff's claim that he had standing to sue as president and director of the company" as a type of derivative injury and "found that the defendants' threats to injure the plaintiff had been directed at the plaintiff only 'because of his positions of employment with the [c]ompany' and therefore did not afford him standing." A. Terzi Prods., Inc. v. Theatrical Protective Union, 2 F. Supp. 2d 485, 497 (S.D.N.Y. 1998) (Sotomayor, J.) (quoting Manson v. Stacescu, 11 F.3d 1127, 1132 (2d Cir. 1993) ("The threats . . . were part of a RICO scheme that was directed at the Company, not [him].")).

In the present case, the first type of injury Stewart alleges—the diminution of the value of his ownership stake in imINDY and the undercapitalization of imINDY—is entirely derivative of injuries to imINDY.  Therefore, even taking as true the allegation that the Defendants diverted money and business opportunities away from imINDY, these alleged injuries alone cannot establish Stewart's individual standing to bring a claim under 18 U.S.C. § 1962(c).  See Brennan, 973 F.2d at 648.  And this is still the case, as noted in Craig Outdoor, even though Stewart "could not have pursued a derivative action because he no longer held stock in the allegedly injured company or he was otherwise barred from bringing a derivative suit."  See 528 F.3d at 1025.

The second kind of injury Stewart alleges is that the enterprise's scheme led to Stewart's "eventual undervalued acceptance of the Buyout Agreement."  However, the devaluation of imINDY before the sale of Stewart's share of the LLC does not qualify as a direct injury.  Here, like the plaintiffs in Craig Outdoor and Lakonia Management Ltd., Stewart pleaded that he had at least some knowledge of the allegedly fraudulent conduct before signing the Buyout Agreement. Stewart alleges that on August 11, 2021, he learned through imINDY's website of business decisions that he knew that he had not authorized.  Doc. 1 ¶ 66.  Stewart also alleges that on May 26, 2023, he emailed PCB Branch Manager Phil Bedinger to request "assistance in reviewing the Account for all international transactions," after which Bedinger provided Stewart information on payment to TeeLaunch LB from May 25, 2021 to May 6, 2023.  Id. ¶ 80; Doc. 1-16.  Stewart has alleged that on June 1, 2023, with the assistance of counsel, he received access to imINDY's QuickBooks, "including general ledgers for each year imINDY operated."  Doc. 1 ¶¶ 83–85. Stewart also received information from imINDY's account at PCB in the summer of 2023. See Doc. 1-15 (noting certain payments were pending as of June 21, 2023).  Stewart then alleges that on or about September 1, 2023, he discovered that imINDY had been paying large amounts

of money to unknown entities registered to the same address as Chris and Nick's house or imINDY's facility. Doc. 1 ¶ 87. Shortly after this, Stewart alleges that he alerted PCB that "it was in violation of the TPAA," after which Marbus hosted a meeting with Stewart, Chris, and Nick and stated that "he would begin to enforce the TPAA." Id. ¶¶ 88, 92 (emphasis omitted). Stewart alleges that on September 25, 2023, he was able to access the PCB financial account by resetting the password through Bedinger at PCB. See id. ¶ 106. Stewart alleges that at this time, he believed "some records were incorrectly kept" but that he "did not know the extent of the misinformation." Id. ¶ 108 (emphasis omitted). Finally, in an email exhibit attached by Stewart to the Complaint, counsel for Stewart advised him on September 26, 2023, that Stewart could "get a forensic accountant and have them perform an audit at any time." Doc. 1-18 at 5. However, without performing an audit and while still represented by counsel, Stewart signed the Buyout Agreement on September 27, 2023. Doc. 1 ¶ 108; Doc. 1-23.[9]

Stewart, like the plaintiffs in Prichard, cannot base his RICO claim in his individual capacity "on frauds [he] say[s] occurred *prior* to [his] selling [his] shares in [the company] to defendants." Prichard, 390 F. Supp. 2d at 411. Taking the allegations in the Complaint as true, "it appears that [Stewart] could have brought a derivative action on behalf of [imINDY] prior to the sale of his shares," and therefore, Stewart, as a former shareholder "lacks standing to pursue derivative claims individually even where, as in this case, the shareholder could not have pursued

---

[9] Beyond the information alleged in the Complaint and accompanying exhibits, Stewart's briefing acknowledged that he knew of at least some of the alleged fraud before he signed the Buyout Agreement. See Doc. 60 at 12 ("While Parker may have noticed *some* suspicious transactions from a mere fraction of the Enterprise, it was in the context of imINDY's imminent dissolution, Parker's extreme economic duress, and Chris' [sic] threats of destroying the Company. Compl. at ¶ 108. If he had known the incredible magnitude of the concealed fraudulent scheme, he would not have signed the Buyout Agreement. However, that was not feasible under the circumstances.") (emphasis in original).

a derivative action because he no longer held stock in the allegedly injured company." See Craig Outdoor, 528 F.3d at 1025, 1025 n.11.

Plaintiffs rely on Arent v. Distribution Sciences, Inc., 975 F.2d 1370 (8th Cir. 1992), which actually affirmed the dismissal of direct shareholder claims as derivative. See 975 F.2d at 1372–75. The portion of Arent Stewart cites referred to a 1986 Eighth Circuit case concerning direct fraud on plaintiff shareholders who alleged they did not discover the fraud until after the sale. See Doc. 61 at 33 (citing Arent v. Distrib. Scis., Inc., 975 F.2d 1370 (8th Cir. 1992) (citing Grogan v. Garner, 806 F.2d 829 (8th Cir. 1986))); see also Grogan, 806 F.2d at 832–33, 836 (reviewing the underlying allegations concerning the fraud) ("No doubt, the plaintiffs could have brought a derivative action had they known all the facts at the October 21 meeting."). As discussed above, however, other and more recent Eighth Circuit precedent has chosen not to extend Grogan to situations such as what Stewart alleges. See Craig Outdoor, 528 F.3d at 1025, 1025 n.11; Brennan, 973 F.2d at 648 n.5 (distinguishing Grogan and finding that a suit against misappropriation of corporate assets is a derivative claim).

Much of Stewart's Complaint contends that the behavior underlying the alleged RICO scheme targeted the company itself rather than Stewart. Stewart alleges that "Chris . . . intentionally concealed imINDY's books and records . . . and fraudulently misrepresented the financial condition of imINDY . . . to prevent [Stewart] from discovering the unlawful actions undertaken by the RICO Enterprise." Doc. 1 ¶ 138(i) (citing paragraphs above). Stewart also alleged that he was denied access to QuickBooks, threatened by Chris that "he [Chris] would torpedo imINDY and deplete its money if [Stewart] continued to ask about the Company's books and records," and lied to as to the true balances of imINDY during buyout negotiations. See Doc. 1 ¶ 99. However, similar to the plaintiff in Manson, who "claimed that the defendants threatened

him with financial ruin and bodily harm when he tried to protect the company's interests," the threats at issue here do not give Stewart individual standing to sue under RICO because the alleged RICO scheme, including the threats to torpedo imINDY and deplete its funds, targeted imINDY rather than Stewart himself. See A. Terzi Prods., Inc., 2 F. Supp. 2d at 497 (citing Manson, 11 F.3d at 1129) (reviewing Manson where injuries had been "directed at the plaintiff only 'because of his positions of employment with the [c]ompany' and therefore did not afford him standing").

Stewart also alleges that "Chris and Nick fraudulently and falsely represented during the Buyout Agreement negotiations that imINDY was failing . . . [h]owever, the Account's balance was decreased through the RICO Enterprise[] . . . [and] [Stewart's] financial interest in imINDY was knowingly depleted." Doc. 1 ¶ 138(g) (citing paragraphs above). Although Stewart alleges these actions affected him directly, imINDY remained the primary target of the alleged RICO scheme given that (1) "the defendants' acts had been directed at the company" and (2) no "defendant owed him an independent duty that is distinguishable from the duty owed to the corporation" or "that was separate and distinct from the duty owed to the other shareholder." A. Terzi Prods., Inc., 2 F. Supp. 2d at 497 (cleaned up and citation omitted). Therefore, the conduct he has alleged, which impacted his "eventual undervalued acceptance of the Buyout Agreement," cannot form the basis for a direct injury to establish standing under RICO.

The third kind of RICO-based injury alleged is that the enterprise's scheme withheld Stewart's salary and quarterly disbursements, instead diverting the money to other companies founded by Chris and Nick, which led to Stewart's "loss of rightful earnings from imINDY." Doc. 1 ¶ 140; see also id. ¶¶ 156, 170. As discussed above, the allegedly diminished quarterly disbursements are a type of diminution in the value of shares that qualifies as a derivative injury. See Brennan, 973 F.2d 648. In addition, loss of compensation is not a basis for a civil RICO claim.

Hamm v. Rhone-Poulenc Rorer Pharms., Inc., 187 F.3d 941, 947 (8th Cir. 1999) ("Counsel for appellants conceded that, under Bowman, appellants could not base a civil RICO claim on allegations of wrongful discharge, denial of promotion, *loss of compensation* or benefits, harassment or intimidation, and retaliation.") (emphasis added); Bowman v. W. Auto Supply Co., 985 F.2d 383, 385–86 (8th Cir. 1993). See also Beck v. Prupis, 529 U.S. 494, 500, 507 (2000) (citing Bowman, 985 F.2d at 388 and concluding "that a person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act that is not an act of racketeering or otherwise unlawful under the statute").

Finally, Stewart alleges "damage to professional reputation" or "personal well-being" to seek to establish individual standing for a civil RICO claim. "Damage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)." Hamm, 187 F.3d at 954. Earlier this year, the Supreme Court of the United States also clarified what "kinds of harm for which the plaintiff can recover": "§ 1964(c) does not allow recovery for all harms . . . [and] by explicitly permitting recovery for harms to business and property, it implicitly excludes recovery for harm to one's person." Med. Marijuana, Inc. v. Horn, 604 U.S. 593, 601 (2025) (citations omitted). Therefore, "damage to professional reputation" or "personal well-being" also fails to establish standing for Stewart's individual civil RICO claim under 18 U.S.C. § 1964(c) alleging a violation of § 1962(b).

Even when the allegations in the Complaint are taken as true, Stewart has not asserted an "individual and direct injury to the shareholder" independent of the alleged corporate injuries to imINDY that would allow him to bring this civil RICO claim. Stewart's reliance on derivative injuries allegedly suffered by imINDY to establish civil RICO standing fails without a showing of a direct injury.

Because of an absence of prudential standing and Stewart not being the real party in interest to pursue the RICO claims, Counts 2, 3, and 4 are dismissed without prejudice. See Christian Lab. Ass'n v. City of Duluth, 142 F.4th 1107, 1111 (8th Cir. 2025) ("If either Article III or prudential standing is absent, the appropriate remedy is to dismiss the case without prejudice.") (cleaned up and citation omitted). Because this Court has dismissed Stewart's RICO claims—Stewart's only claims with original federal jurisdiction—the Court declines to exercise supplemental jurisdiction over the remaining state-law claims. 28 U.S.C. § 1367(c)(3); Mountain Home Flight Serv., Inc. v. Baxter Cnty., 758 F.3d 1038, 1045 (8th Cir. 2014) (holding that district court acted within its discretion by declining to exercise supplemental jurisdiction after dismissing § 1983 claims). The state-law claims are also dismissed without prejudice.

## IV.    Absence of Personal Jurisdiction over District Photo

District Photo moves to dismiss under Federal Rule of Civil Procedure 12(b)(2) and argues that Plaintiffs have not established that this Court has personal jurisdiction over District Photo. Doc. 58 at 3–5. The showing a plaintiff must make when the defendant contests personal jurisdiction under Rule 12(b)(2) depends on the stage of the case and the method the court employs to resolve the jurisdictional dispute. See K-V Pharm. Co. v. J. Uriach & CIA, S.A., 648 F.3d 588, 591–92 (8th Cir. 2011); Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991). At trial or after an evidentiary hearing, the plaintiff must prove personal jurisdiction by a preponderance of the evidence. Creative Calling Sols., Inc. v. LF Beauty Ltd., 799 F.3d 975, 979 (8th Cir. 2015); Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 647 (8th Cir. 2003). But when, as here, the court limits its review of a Rule 12(b)(2) motion solely to affidavits and other written evidence, the plaintiff "need only make a prima facie showing of [personal] jurisdiction." Dakota Indus., Inc., 946 F.2d at 1387. "Although the evidentiary showing required at the prima

27

facie stage is minimal, the showing must be tested, not by the pleadings alone, but by the affidavits and exhibits supporting or opposing the motion." <u>K-V Pharm. Co.</u>, 648 F.3d at 592 (internal marks and citations omitted).

District Photo did not provide this Court with an affidavit of relevant information and instead attached a document that appears to be a printout of a public record. <u>See</u> Docs. 58, 58-1. Given the lack of standing, however, this Court need not decide whether personal jurisdiction exists over District Photo in South Dakota.

V.    **Leave to Amend**

Before the motion hearing on September 8, 2025, Plaintiffs had not filed any motion seeking leave to amend but requested in briefing that if the motions to dismiss are granted, they be given leave to amend the complaint; Plaintiffs then attached proposed amended complaints in places in the record. <u>See</u> Doc. 60 at 4; Doc. 60-1; Doc. 61 at 4–5; Doc. 61-1; Doc. 64 at 5; Doc. 64-1. After the motion hearing, on September 15, 2025, Plaintiffs filed a Motion for Leave to File Amended Complaint and attached a proposed amended complaint that differed somewhat from the proposed amended complaints attached to prior briefing. <u>See</u> Docs. 81, 81-1.

Federal Rule of Civil Procedure 15(a) provides that "a party may amend its pleading . . . with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Under Rule 15(a), "[t]he court should freely give leave [to amend the complaint] when justice so requires," Fed. R. Civ. P. 15(a)(2), and "[a] decision whether to allow a party to amend [a] complaint is left to the sound discretion of the district court," <u>Popoalii v. Corr. Med. Servs.</u>, 512 F.3d 488, 497 (8th Cir. 2008). <u>See also</u> <u>Plymouth Cty. v. Merscorp, Inc.</u>, 774 F.3d 1155, 1160 (8th Cir. 2014) (motions for leave to amend "should be freely given in order to promote justice"). Denial of a motion to amend "is appropriate only in those limited circumstances in which undue

28

delay, bad faith on the part of the moving party, futility of the amendment, or unfair prejudice to the non-moving party can be demonstrated." Hillesheim v. Myron's Cards & Gifts, Inc., 897 F.3d 953, 955 (8th Cir. 2018) (citation omitted). "An amendment is futile if the amended claim could not withstand a motion to dismiss under Rule 12(b)(6)." Id. (cleaned up and citation omitted).

In the leave-to-amend context, the Eighth Circuit and other district courts have "evaluated whether a proposed amended complaint could 'survive a motion to dismiss for lack of standing.'" Burgess v. CS3 BP Assocs. LLC, No. 4:22-CV-00063, 2022 WL 2643505, at *6 (E.D. Mo. July 8, 2022) (citing In re Senior Cottages of Am., LLC, 482 F.3d 997, 1001, 1005 (8th Cir. 2007)). "[W]hen a court denies leave to amend on the ground of futility, it means that the court reached a legal conclusion that the amended complaint could not withstand a Rule 12 motion." In re Senior Cottages of Am., LLC, 482 F.3d at 1001.

Under the case law examined above, Stewart cannot plead any derivative actions on behalf of imINDY without being a current member. SDCL § 47-34A-1103(a). In addition, Stewart must plead a direct injury in order to establish individual standing for his civil RICO claims. Brennan, 973 F.2d at 648. Stewart has failed to plausibly allege in both his original Complaint and his proposed amended complaints that he is currently a member of imINDY[10] or that he has suffered any direct injuries that would establish civil RICO standing. None of the Plaintiffs' proposed

---

[10] In the earlier proposed amended complaints, Stewart changes his title in the caption to include "Stewart, Individually and as 50% Owner of imINDY, LLC." See Doc. 60-1 at 2. The only other amendments seem to be to Count XIV (state law claim against Marbus and the bank for aiding and abetting). See Doc. 60-1 at 78. On the proposed amended complaint attached to the newly-filed motion, Stewart does not make the change to the caption. Instead, Plaintiffs add a footnote about District Photo's successor liability by acquiring assets and possibly "merg[ing]/consolidat[ing]" with imINDY, Doc. 81-1 at 5 n.1; and repeated allegations that PCB and Marbus "actively exerted actual control, initiated aspects, directed the affairs, helped manage the basic structure, facilitated meetings in the ordinary course, operated or managed, and repeatedly sought indemnification for their active role in the RICO Enterprise alleged herein." Doc. 81-1 ¶¶ 144, 158, 176.

amendments alter any of the analysis of Part III of this Opinion and Order. Therefore, the Court finds that the proposed amendments would be futile.

## VI.     Unserved and Non-Represented Parties

Two Defendants are either unserved or not represented presently. As noted above, Ted Hamze passed away on February 14, 2025. See Doc. 51. At the motion hearing on September 8, 2025, the attorney previously representing Ted Hamze advised that no estate had been opened for Ted Hamze since the filing of Jane Hamze's affidavit, Doc. 51, nor were there plans to open one in the future. On June 4, 2025, Plaintiffs moved for alternative service of TeeLaunch LB, a Lebanese entity, after attempting previously to serve TeeLaunch LB by mail in March 2025. Doc. 74; Doc. 76-1 at 7–8, 219–21.

This Court has determined that Stewart may not bring claims on behalf of imINDY as a former shareholder and that Stewart's reliance on derivative injuries allegedly suffered by imINDY to establish civil RICO standing fails without a showing of a direct injury. See supra Section III.B. This Court also has declined to exercise supplemental jurisdiction over the remaining state-law claims. Id. That justifies dismissing without prejudice all claims against all Defendants, including Ted Hamze and TeeLaunch LB. If Plaintiffs wish to sue these same Defendants, including TeeLaunch LB, in state court, they can file a motion for alternative service on TeeLaunch LB then and can decide how and whether to name Ted Hamze as a defendant.

## VII.     Conclusion

For the foregoing reasons, it is

ORDERED that Defendants' Motions to Dismiss, Docs. 38, 41, 57, are granted. It is further

ORDERED that Plaintiffs' Motion for Alternative Service of TeeLaunch LB, Doc. 74, is denied as moot. It is further

ORDERED that Plaintiffs' Motion for Leave to File Amended Complaint, Doc. 81, is denied as futile. It is further

ORDERED that Plaintiffs' Complaint, Doc. 1, is dismissed without prejudice.


DATED this 23ʳᵈ day of September, 2025.

BY THE COURT:


ROBERTO A. LANGE
CHIEF JUDGE